# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **FAYNE J. SYKES,** | ) | |
| Plaintiff | ) | Civil Action No. 2:20cv00018 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **KILOLO KIJAKAZI,**[1] | ) | By: Pamela Meade Sargent |
| **Acting Commissioner of Social** | ) | United States Magistrate Judge |
| **Security,** | ) | |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Fayne J. Sykes, ("Sykes"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Sykes protectively filed applications for DIB and SSI on February 18, 2016, alleging disability as of March 31, 2015, due to a heart murmur; anxiety; "nerve" problems; osteoarthritis; inability to read or write "good;" hearing problems; and back, neck and hip problems. (Record, ("R."), at 15, 331-38, 351, 363, 397.) The claims were denied initially and on reconsideration. (R. at 212-14, 218-25.) Sykes requested a hearing before an administrative law judge, ("ALJ"). (R. at 226-27.) A hearing was held on September 24, 2018, and a supplemental hearing[2] was held on March 4, 2019, at both of which Sykes was represented by counsel. (R. at 40-57, 59-105.)

By decision dated September 4, 2019, the ALJ denied Sykes's claims. (R. at 15-31.) The ALJ found Sykes met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018. (R. at 17.) The ALJ found Sykes had not engaged in substantial gainful activity since March 31, 2015, the alleged onset date. (R. at 17.) The ALJ determined Sykes had severe impairments,

---

[2] A supplemental hearing was held after Sykes filed an objection to the medical interrogatories completed by medical expert, Dr. John A. Pella, M.D. (R. at 15, 42, 431-32, 1364-66.) Sykes argued Dr. Pella was a pulmonologist, and it was unclear what his expertise was in orthopedics or rheumatology. (R. at 42.) Sykes's request to strike the evidence was denied, but he was allowed to submit additional questions to the medical expert. (R. at 15, 44-45.) Dr. Pella responded to the additional interrogatories submitted by Sykes. (R. at 15, 1447-48.) By letter dated June 19, 2019, Sykes's attorney asked that Dr. Pella's opinion not be considered an expert opinion and requested it be given less weight. (R. at 15, 443.)

namely lumbar degenerative disc disease; cervicalgia; left cubital tunnel syndrome; headaches; hip osteoarthritis; gluteal abscess; social phobia; panic disorder; depression; attention deficit hyperactivity disorder, ("ADHD"); and substance abuse, but he found Sykes did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.)

The ALJ found Sykes had the residual functional capacity to perform light[3] work, except he could occasionally perform postural activities, but could not crawl or climb ladders, ropes or scaffolds; he could frequently perform reaching, handling, fingering and feeling with the left upper extremity; he should avoid concentrated exposure to industrial hazards; he could understand, remember and carry out simple instructions and perform simple tasks; he could occasionally interact with others; he could adapt to occasional changes in a customary workplace setting; he could not perform a job with reading or writing requirements; and he would be expected to be off task less than 10 percent of the workday. (R. at 21.) The ALJ found Sykes was unable to perform any of his past relevant work. (R. at 29.) Based on Sykes's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Sykes could perform, including the jobs of a laundry worker, a housekeeper and a packing line worker. (R. at 29-30, 97-98.) Thus, the ALJ concluded Sykes was not under a disability as defined by the Act, and he was not eligible for SSI and DIB benefits. (R. at 30-31.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2020).

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2020).

After the ALJ issued his decision, Sykes pursued his administrative appeals, (R. at 326-28), but the Appeals Council denied his request for review. (R. at 1-5.) Sykes then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2020). This case is before this court on Sykes's motion for summary judgment filed February 18, 2021, and the Commissioner's motion for summary judgment filed March 22, 2021.

## II. Facts

Sykes was born in 1990, (R. at 47, 62), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has an eighth-grade education and past work experience as a roof bolter, a shuttle car operator and a sweep operator. (R. at 47, 52, 352.) Sykes testified he attempted, on two occasions, to obtain a general educational development, ("GED"), diploma, but failed both times, stating he did not get past the third-grade level. (R. at 47-48, 62-63.) Sykes stated he could write "some" and read "very little." (R. at 63.) Sykes stated he had been incarcerated for public intoxication, driving under the influence and vehicular homicide. (R. at 1175, 1291.) Sykes reported he had no trouble concentrating on things, such as reading the newspaper or watching television. (R. at 1036.) In 2017, Sykes stated he worked on his farm. (R. at 735.) He stated he took care of bees by changing out the feed boxes in the beehive stands and giving the bees sugar water. (R. at 770.)

In rendering his decision, the ALJ reviewed records from Lonesome Pine Hospital; Quillen College of Medicine; Family Medicine – Johnson City; Appalachian Orthopaedic Associates, P.C., ("Appalachian Orthopaedic"); Clinch

Valley Comprehensive Treatment Center, ("Clinch Valley"); ETSU – Acute Care Surgery; Holston Valley Medical Center, ("Holston Valley"); Ridgeview Pavilion; Frontier Health; Melinda M. Fields, Ph.D., a licensed psychologist; Norton Community Hospital; Dickenson Community Hospital; Dr. Tony Constant, M.D., a state agency physician; William Carne, Ph.D., a state agency psychologist; Dr. Patrick J. Riggins, M.D.; Dr. Andrew Bockner, M.D., a state agency physician; Dr. Gene Godwin, M.D., a state agency physician; Overmountain Recovery; Johnson City Medical Center; Dr. John A. Pella, M.D., a medical expert; Haysi Clinic; Dr. James Abrokwah, M.D.; Family Preservation Services; Mountain View Regional Medical Center, ("Mountain View"); and Restoration & Wellness.

On February 24, 2015, Sykes was admitted to Ridgeview Pavilion for a psychiatric evaluation after he overdosed on methadone in a suicide attempt. (R. at 818-40, 901-05.) He stated he abused his methadone prescription, and he purchased benzodiazepines and opiates "off the street." (R. at 823.) On March 2, 2015, Sykes was discharged with diagnoses of depression and polysubstance abuse. (R. at 838.)

On May 19, 2015, Sykes saw Malena Mullins, N.P.-C., a certified nurse practitioner at Haysi Clinic, for complaints of anxiety, which rendered him unable to be in social situations and anxious with simple interactions. (R. at 462.) Sykes denied back or neck pain, stiffness, limitation of joint movement and muscle pain and weakness. (R. at 463.) Sykes had appropriate judgment and good insight; he was fully oriented; his recent and remote memory were intact; and he had a euthymic mood and appropriate affect. (R. at 463.) He was diagnosed with depressive disorder, not elsewhere classified, and generalized anxiety disorder. (R. at 464.)

On March 3, 2016, Sykes saw Dr. Michael W. Wheatley, M.D., for complaints of anxiety, which he attributed to family issues. (R. at 841-46.) He denied back pain and joint swelling. (R. at 842.) Sykes's neck and musculoskeletal system had normal range of motion and no tenderness; he was fully oriented; and his mood, affect and behavior were normal. (R. at 843.) Dr. Wheatley diagnosed generalized anxiety disorder (R. at 843.)

On April 13, 2016, Sykes presented to the emergency department at Norton Community Hospital for back pain. (R. at 847-50.) Sykes's bilateral lower thoracic spine exhibited tenderness, swelling, pain and spasm, but he had normal range of motion; he was fully oriented; he had normal reflexes; and his mood, affect and behavior were normal. (R. at 849.) He was diagnosed with back pain and spasm. (R. at 850.)

From April 18, 2016, through August 3, 2016, Sykes saw Dr. James Abrokwah, M.D., for complaints of back and left leg pain, anxiety, attention deficit, racing thoughts and an inability to finish tasks.[4] (R. at 559, 561, 563, 565.) During this time, Sykes reported his pain was adequately controlled with medication, and he was able to perform housework and some yard work. (R. at 559, 561, 563, 565.) Sykes was fully oriented; he was not agitated or depressed; he exhibited no tremor; he had no vertebral tenderness; he exhibited signs of lumbar spondylosis with left sciatica; his straight leg raising tests were reduced on the left; and he had disuse atrophy. (R. at 565-66.) Dr. Abrokwah reported Sykes's pain,

---

[4] In July 2016, Sykes reported he had stopped taking methadone. (R. at 561.) He was fully oriented, but he stuttered and had difficulty constructing sentences. (R. at 561.) In August 2016, Sykes reported his symptoms were exacerbated by his father being incarcerated for felony attempted murder and malicious wounding. (R. at 559, 1239.) Sykes was agitated and depressed, and his speech was pressured. (R. at 559.)

anxiety, depression and insomnia were controlled. (R. at 559, 561, 563, 566.) Dr. Abrokwah diagnosed spondylosis with radiculopathy in the lumbar region; anxiety; depression; acute inflammation of laryngopharynx; developmental learning difficulties; mixed insomnia; and restless leg syndrome, and Sykes was encouraged to exercise. (R. at 560, 562, 564, 566.)

On May 26, 2016, Sykes's family brought him to the emergency department at Dickenson Community Hospital due to an overdose and altered mental state. (R. at 507-21.) A urine drug screen was positive for methadone, opiates and tricyclics. (R. at 511.) Sykes was transferred to the intensive care unit at Norton Community Hospital for toxic encephalopathy. (R. at 522-34.) Sykes reported a history of intravenous drug use, inhalation of unknown pills and use of illicit drugs. (R. at 527.) A CT scan of Sykes's head showed no abnormality. (R. at 534.) Sykes was evaluated by Lara Lilly, M.Ed., a resident in counseling at Frontier Health, who diagnosed opioid dependence and generalized anxiety disorder, and it was recommended that Sykes seek follow-up treatment at Dickenson County Behavioral Health Service. (R. at 545-56.)

On August 25, 2016, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated Sykes at the request of Disability Determination Services. (R. at 567-71.) Sykes stated he spent the day "piddling," and his activities included preparing his meals, hunting, fishing and ginseng hunting. (R. at 568.) Sykes was cooperative; he had adequate eye contact; his speech was pressured, and he stuttered; stream of thought was organized and logical; he exhibited no evidence of thought content impairment, hallucinations or delusions; his mood was anxious; he displayed hand tremors and facial flushing; his affect was restricted; he had impaired judgment; his immediate memory was intact; his recent and remote memory were impaired;

his insight was fair; his concentration was adequate; and his pace was normal. (R. at 569-70.) Fields opined that Sykes's social functioning was impacted by impaired auditory acuity, anxious mood, hand tremors and pressured, stuttering speech. (R. at 570.) Fields diagnosed panic disorder, opioid use disorder, alcohol use disorder and ADHD. (R. at 570.) Fields opined it was "unlikely" Sykes would complete a typical workweek without presentation of symptoms, and he possibly could experience an exacerbation in symptoms if faced with stressors inherent in gainful employment. (R. at 571.) Additionally, she opined it was likely Sykes would have difficulty interacting appropriately with supervisors, co-workers or the public. (R. at 571.) She deemed his prognosis as guarded with appropriate treatment and environmental support. (R. at 570.)

On August 31, 2016, Dr. Tony Constant, M.D., a state agency physician, completed a medical assessment, finding Sykes could perform light work, except he could stand, walk and sit six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; occasionally climb, stoop, kneel, crouch and crawl; and he had no limitations on his ability to balance. (R. at 143-44.) Dr. Constant opined Sykes had no manipulative, visual, communicative or environmental limitations. (R. at 144.)

On September 3, 2016, William Carne, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Sykes had mild[5] restrictions on his activities of daily living; moderate[6] difficulties in

---

[5] The regulations define "mild limitations" as an individual's ability to function independently, appropriately, effectively and on a sustained basis as slightly limited. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(b) (2020).

maintaining social functioning and in maintaining concentration, persistence or pace; and he had not experienced repeated episodes of decompensation of extended duration. (R. at 140-41.)

That same day, Carne also completed a mental assessment, indicating Sykes had moderate limitations in his ability to understand, remember and carry out detailed instructions; to work in coordination with or in proximity to others without being distracted by them; to interact appropriately with the general public; and to respond appropriately to changes in the work setting. (R. at 144-46.) Carne also found Sykes was markedly[7] limited in his ability to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 145.) Carne stated Sykes's work-related mental abilities were, otherwise, not significantly limited. (R. at 144-46.) He opined Sykes could perform simple, unskilled work. (R. at 146.)

On September 30, 2016, Sykes was psychiatrically evaluated by Cindy Vaughn, N.P.-C., a certified nurse practitioner with Family Preservation Services. (R. at 572-76.) Sykes reported he did not like being in crowds, he had difficulty concentrating and had a lot of stress related to his father's incarceration. (R. at

---

[6] The regulations define "moderate limitations" as an individual's ability to function independently, appropriately, effectively and on a sustained basis as fair. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2020).

[7] The regulations define "marked limitations" as an individual's ability to function independently, appropriately, effectively and on a sustained basis as seriously limited. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(d) (2020).

572.) Sykes's appearance, behavior and speech were normal; his mood was anxious and depressed; he had a normal affect; his recent, remote and immediate memory were intact; he was fully oriented; and his thought process, thought content and perception were normal. (R. at 574-75.) Vaughn diagnosed major depressive disorder, recurrent episode, severe. (R. at 575.) In October and December 2016, Sykes's depression was described as moderate and situational; he was dressed appropriately; he had good hygiene; he had a normal gait; his speech was clear; he had normal thought process and thought content; he had sufficient attention and concentration; he was fully oriented; he had normal judgment and insight; he had an optimistic mood and friendly affect; and his recent and remote memory were fair.[8] (R. at 1067, 1069.)

On November 12, 2016, Sykes presented to the emergency department at Norton Community Hospital due to an altered mental status after using opiates. (R. at 682-99.) A urine drug screen was positive for benzodiazepines and opiates. (R. at 689.) Sykes was transferred to Holston Valley where an MRI of his brain revealed minimal white matter disease in the left frontal lobe. (R. at 685, 851-60.) Sykes was discharged on November 15, 2016, in good condition. (R. at 856.)

In January 2017, Sykes presented to three emergency departments for complaints of left hand, wrist, arm and shoulder pain and contracture of his left ring and little finger.[9] (R. at 673-81, 715-34, 866-69.) X-rays of Sykes's left hip, right shoulder and cervical spine were normal. (R. at 677-79.) X-rays of Sykes's left hand showed swelling without acute findings. (R. at 681.) X-rays of Sykes's

---

[8] Sykes's diagnosis and examination findings remained unchanged in January and February 2017, except he had a depressed mood and an anxious affect. (R. at 1063-66.)

[9] Sykes's dates of service were January 1, 5 and 13, 2017.

left elbow were normal. (R. at 719, 733.) A CT scan of Sykes's cervical spine was normal. (R. at 719, 733.) Sykes's left small finger and ring finger were contracted, but he had full range of motion of all fingers, bilaterally; and he was tender to palpation at the left cubital tunnel. (R. at 868.) Sykes was diagnosed with left hand swelling and increased tone of the fourth and fifth digits, possibly from a pinched nerve or carpal tunnel syndrome; ulnar neuritis on the left; chronic, bilateral shoulder pain; left arm numbness; and left hip pain.  (R. at 675, 718, 869.)

On February 16, 2017, Sykes saw Dr. Patrick J. Riggins, M.D., and reported left hand and neck pain. (R. at 735-36.) Sykes had "fairly good" motion of his neck with no pain or burning; he held his left hand and the ulnar two digits in a flexed position; he had a positive Tinel's sign over the ulnar nerve at the left elbow and a positive elbow flexion test; and he had decreased sensation in the ulnar nerve distribution. (R. at 735.) X-rays of Sykes's left hand showed mild soft tissue swelling. (R. at 735.) Dr. Riggins diagnosed cubital tunnel syndrome; rule out potential cervical radicular problem; and rule out underlying neuromuscular condition (R. at 736.) The following month, Dr. Riggins again diagnosed cubital tunnel syndrome of the left arm; and an area of induration, which Sykes claimed was secondary to donating plasma, and he referred Sykes to a specialist for a possible cubital tunnel release. (R. at 751.)

On March 2, 2017, Sykes presented to the emergency department at Mountain View with complaints of spine pain, after sitting on a bucket, and bilateral, chronic shoulder pain. (R. at 738-44.) A CT scan of Sykes's cervical spine showed no evidence of acute cervical spine fracture or subluxation; his thoracic spine CT scan was normal; and his lumbar spine CT scan showed minimal multi-level degenerative disc disease and mild splenomegaly. (R. at 741-44.) Sykes

was diagnosed with chronic, bilateral shoulder pain; low back pain without sciatica, unspecified back pain laterality, unspecified chronicity; neck pain; and left ulnar neuritis. (R. at 740.)

On March 3, 2017, Sykes underwent a neurography and electromyography, which showed left ulnar neuropathy at the elbow. (R. at 745-48.) That evening, Sykes presented to Holston Valley with complaints of neck pain, bilateral arm and wrist pain. (R. at 752-59.) On examination, Sykes had some tenderness of the cervical back, but normal range of motion and no swelling, edema or spasms; and his mood, affect and behavior were normal. (R. at 756.) He was given an injection for pain and discharged with a diagnosis of chronic neck pain. (R. at 757.)

On March 21, 2017, Dr. Andrew Bockner, M.D., a state agency physician, completed a PRTF, finding Sykes had mild limitations in his ability to adapt or manage himself and moderate limitations in his ability to understand, remember or apply information, to interact with others and to concentrate, persist or maintain pace. (R. at 179-80.)

That same day, Dr. Bockner also completed a mental assessment, indicating Sykes had moderate limitations in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond

appropriately to changes in the work setting. (R. at 184-86.) Dr. Bockner stated Sykes's work-related mental abilities were, otherwise, not significantly limited. (R. at 184-86.)

On March 22, 2017, Dr. Gene Godwin, M.D., a state agency physician, completed a medical assessment, finding Sykes could perform light work, except he could stand, walk and sit six hours each in an eight-hour workday; occasionally push/pull with his bilateral upper extremities; occasionally climb ramps and stairs, balance, stoop, kneel and crouch; never climb ladders, ropes or scaffolds and crawl; and he should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 182-83.) Dr. Godwin opined Sykes had no manipulative, visual or communicative limitations. (R. at 183.)

From April 4, 2017, through June 28, 2017, Sykes received outpatient treatment for opioid replacement therapy at Clinch Valley.[10] (R. at 768-83.) During this time, Sykes had 25 urine drug screens, which were positive for methamphetamine; amphetamine; benzodiazepine; opioids; marijuana; Risperdal; and oxycodone. (R. at 777-78.)

On August 3, 2017, Sykes was admitted to Restoration & Wellness for substance abuse treatment. (R. at 1110-1262.) He admitted to having used amphetamines, benzodiazepines, marijuana, methamphetamines and opiates within the prior few weeks. (R. at 1162.) On mental status examination, Sykes was neat with appropriate attire; he was cooperative; he had appropriate thought process, speech and affect; and he was alert and fully oriented. (R. at 1167-68.) In

---

[10] This was Sykes's third attempt in a treatment facility. (R. at 770.)

December 2017, Sykes explained to his counselor that, he had been accused of, but not charged with, manufacturing methamphetamine. (R. at 1239.) That same month, Sykes's case manager provided him with the opportunity to apply for work at Kelly Services. (R. at 1238.) On January 2, 2018, Dr. Cham Johnston M.D., diagnosed Sykes with tobacco use disorder; severe anxiety; opioid use disorder, severe, dependence; long term current use of opiate analgesic; long term current drug therapy; benzodiazepine abuse; insomnia; and nicotine dependence. (R. at 1256-62.)

From August 29, 2017, through December 27, 2017, Sykes saw Dr. Abrokwah, reporting back, hip and arm pain;[11] anxiety; social phobia; depression; and irritability. (R. at 793, 795, 797, 799, 801.) Sykes reported his depression and anxiety were exacerbated by pain and his father's legal problems. (R. at 793, 799.) He reported his symptoms of social phobia, anxiety, agitation and anger improved with medication. (R. at 795, 797, 799.) In November 2017, Sykes reported he went shopping on Black Friday. (R. at 795.) In December 2017, Dr. Abrokwah assessed Sykes's anxiety and depression were not currently under control, but they were very much improved with his medication and that Sykes was stable on his medication regimen. (R. at 794.) Dr. Abrokwah continued to encourage Sykes to exercise. (R. at 794, 796, 798, 800, 802.)

On January 23, 2018, Sykes was admitted to Clinch Valley for outpatient opioid replacement therapy. (R. at 1077-80, 1086, 1097-1106.) He admitted to experiencing some withdrawal symptoms, but stated it was "nothing I haven't been

---

[11] Although Sykes reported back, neck, arm and hip pain in August and September 2017, his counselor reported he had a normal gait and no tremors. (R. at 1181, 1188, 1195, 1202, 1209, 1217, 1225.) On September 19, 2017, Sykes reported he was doing better and working more around the house, as he enjoyed cleaning up old projects. (R. at 1192-93.)

through before." (R. at 1081, 1084.) On examination, Sykes's extremities were nontender with normal range of motion and no edema; his neck was normal; he had no motor or sensory deficit; and his gait was steady and normal. (R. at 1102.) On January 25, 2018, Sykes requested a work excuse. (R. at 1082.) On January 30 and February 5, 2018, urine drug screens were positive for methamphetamine and methadone metabolite. (R. at 1089.)

From February 7, 2018, through December 11, 2018, Sykes saw Dr. Abrokwah, reporting back, neck, thigh and leg pain; anxiety; social phobia; insomnia; agitation; anger; irritability; and night terrors. (R. at 791, 1342, 1378, 1415, 1424.) Again, Sykes related his anxiety, agitation, anger, lack of concentration and social phobia to his father's legal problems. (R. at 1344.) He reported his pain, depression and insomnia had improved with medication. (R. at 790.) In August 2018, Sykes complained of panic attacks, night terrors and pain in both hips and thighs, but stated, "this is the best I have been for a long time…." (R. at 1340.) During this time, Dr. Abrokwah assessed Sykes's pain, anxiety, depression and insomnia were controlled. (R. at 1343, 1377, 1379, 1416, 1425.) He suggested Sykes walk for exercise. (R. at 1341, 1343, 1377, 1379, 1425.) Dr. Abrokwah added night terrors; social phobia; bilateral hip arthritis; and drug abuse to his diagnoses. (R. at 790, 1341.)

From February 16, 2018, through December 17, 2018, Sykes received counseling and methadone treatment for his opioid addiction at Overmountain Recovery. (R. at 1271-1300, 1317-20, 1363, 1380-99.) Sykes's Clinical Opiate Withdrawal Scale, ("COWS"), ranged from mild to moderate; he was fully

oriented; he was well-groomed; he had normal eye contact and speech;[12] he had an appropriate or euthymic mood;[13] he was not depressed; and his gait and eye to hand coordination were not impaired. (R. at 1274, 1276-77, 1279-82, 1296, 1298-1300, 1317, 1320, 1363, 1380-81, 1383-85, 1388, 1392-93.) During this time, Sykes had multiple relapses,[14] which he related to his father being sentenced to prison;[15] his girlfriend leaving him; having 13 teeth extracted;[16] and increased hip pain. (R. at 1272-74, 1299, 1319.) During treatment, the counselor worked with Sykes to develop coping skills, but he did not practice them outside of treatment; therefore, he was unsuccessful in decreasing his drug use. (R. at 1398.) He was discharged after advising he planned to transfer to Clinch Valley due to finances. (R. at 1396, 1398.)

---

[12] In July 2018, Sykes had fixed eye contact and pressured speech, (R. at 1298-1300); in August 2018, Sykes's speech was described as muffled, (R. at 1320); and, in October and November 2018, his speech was described as mumbled. (R. at 1381, 1383-84, 1388.)

[13] In July and November 2018, Sykes had an anxious or frustrated mood. (R. at 1298-1300, 1381, 1384.)

[14] Sykes had 27 appropriate drug screens, 17 inappropriate drug screens, and he attempted to falsify a drug screen in June 2018. (R. at 1273, 1398.)

[15] Sykes reported his father was sentenced to 120 years for shooting three people. (R. at 1272-73.)

[16] On July 24, 2018, Sykes presented to the emergency department at Norton Community Hospital for complaints of facial pain and swelling after having 13 teeth extracted on July 22, 2018. (R. at 1303-16.) Sykes was unable to open his eyes during triage and had difficulty finishing sentences. (R. at 1308.) He was given intravenous fluid and medication and diagnosed with oral pain, status-post extraction; dehydration - dry socket; and polysubstance abuse. (R. at 1304, 1310.)

Sykes was admitted to Johnson City Medical Center from February 18, 2018, through March 1, 2018, for right hip and leg pain and swelling.[17] (R. at 906-90, 1041-43.) An echocardiogram showed normal ejection fraction; mildly increased interventricular septum wall thickness; and mild pulmonary regurgitation. (R. at 910, 947-48.) Chest x-rays showed central opacities likely representing pneumonia. (R. at 976.) A CT pulmonary angiography showed abnormalities of the right thigh, right hip and right gluteal region with phlegmon[18] and inflammation. (R. at 966-68.) Subsequently, on February 27, 2018, Sykes underwent a CT-guided aspiration of gluteal abscesses. (R. at 945, 982-85.) Upon discharge, Sykes was diagnosed with abscess of the buttock, improving; sepsis, resolved; rhabdomyolysis,[19] resolved; polysubstance abuse, stable; and hypokalemia, resolved. (R. at 1041.)

On March 12, 2018, Dr. Abrokwah completed a medical assessment, finding Sykes could occasionally lift and carry items weighing 10 pounds and seven pounds frequently; he could stand and/or walk up to four hours in an eight-hour workday and could do so for up to two hours without interruption; he could sit up to five hours in an eight-hour workday and could do so up to two hours without

---

[17] Sykes was initially seen at the emergency department at Holston Valley for complaints of right lower extremity swelling and pain. (R. at 811-17.) Upon arrival at the emergency department, Sykes initially reported he was on methadone, but later denied this when the physician began discussing his pain medication. (R. at 894.) Sykes left against medical advice after being denied medication stronger than ibuprofen. (R. at 894, 909.)

[18] Phlegmon is an inflammation of soft tissue that spreads under the skin or inside the body and is usually caused by an infection. *See* healthline.com/health/phlegmon#treatment (last visited Mar. 21, 2022).

[19] Rhabdomyolysis is the breakdown of muscle tissue leading to the release of muscle fiber contents into the blood. These substances often cause kidney damage. Rhabdomyolysis may be caused by use of drugs such as cocaine, amphetamines, statins, heroin or PCP. *See* medlineplus.gov/ency/article/000473.htm (last visited Mar. 21, 2022).

interruption; he could occasionally climb, stoop, kneel, balance, crouch and crawl; he had a limited ability to reach, to handle, to feel, to push/pull and to speak; he was restricted from working around heights, moving machinery and vibration; and he would be absent from work more than two days a month. (R. at 804-06.)

On March 22, 2018, Sykes saw Dr. Adam Myers, M.D., a physician with Quillen College of Medicine, and reported continued discomfort, but stated it was improving. (R. at 1038.) He stated he was able to ambulate without assistance and was becoming more active. (R. at 1038.) Sykes had a slow gait that appeared uncomfortable; he had tenderness over the gluteus muscles on the right; and he had an appropriate mood and affect. (R. at 1040.) Dr. Myers diagnosed myositis and advised Sykes he did not need to return, as he could follow up with his primary care provider. (R. at 1040.)

On August 23 and 24, 2018, Sykes presented to two different emergency departments for complaints of swelling in his feet, legs, arms and face. (R. at 1321-35, 1347-59.) A CT scan of Sykes's pelvis was normal. (R. at 1347.) He was diagnosed with edema. (R. at 1352.) Chest x-rays showed no acute cardiopulmonary disease. (R. at 1321.) Sykes was diagnosed with edema, and examination did not reveal deep vein thrombosis. (R. at 1331, 1352.)

On September 6, 2018, Dr. Abrokwah completed a mental assessment, finding Sykes had more than a slight limitation, but still could function satisfactorily, in his ability to maintain personal appearance; and serious limitations, resulting in an unsatisfactory ability, to follow work rules, to relate to co-workers and to function independently. (R. at 1360-62.) He opined Sykes had major limitations, resulting in no useful ability, to deal with the public; to use

judgment in public; to interact with supervisors; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out simple, detailed and complex job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 1360-61.) Dr. Abrokwah opined Sykes could not manage benefits in his own best interest and would be absent from work more than two days monthly. (R. at 1362.)

On September 9, 2018, Sykes was seen at Wellmont Medical Associates with complaints of a cough and shortness of breath. (R. at 1401-10.) Chest x-rays revealed low lung volumes. (R. at 1408.)

On October 1, 2018, Dr. John A. Pella, M.D., a medical expert, completed medical interrogatories related to Sykes's physical impairments.[20] (R. at 1364-66.) Dr. Pella opined Sykes's impairments did not meet or equal any impairment described in the Listing of Impairments. (R. at 1365.) He opined Sykes could occasionally lift and carry items weighing 21 to 50 pounds, 11 to 20 pounds frequently and up to 10 pounds continuously; he could stand and/or walk up to four hours in an eight-hour workday and could do so for up to one hour without interruption; he could sit up to six hours in an eight-hour workday and could do so up to four hours without interruption; he would need to use a cane "transiently" and could use his free hand to carry small objects; he could occasionally climb

---

[20] On June 4, 2019, Dr. Pella submitted additional responses to interrogatories, stating he specialized in internal medicine and pulmonary diseases. (R. at 1447-48.) He stated he served as a medical expert for the Office of Disability Adjudication and Review, ("ODAR"), since 2008, and he had reviewed hundreds of cases involving orthopedic issues and other medical problems. (R. at 1447.)

stairs and ramps, stoop, kneel and balance; and never climb ladders or scaffolds, crouch and crawl; he could frequently use his right hand to reach overhead and to push/pull and continuously use his right hand to reach in all other directions, to handle, to finger and to feel; he could frequently use his left hand to reach, to handle, to finger and to feel; he could occasionally use his left hand to reach overhead and to push/pull; he could frequently use his lower extremities to operate foot controls; he could frequently operate a motor vehicle and work around temperature extremes, vibrations and loud noise; he could occasionally work around moving mechanical parts; and he could never work around unprotected heights. (R. at 1367-72.)

On January 15, 2019, Sykes saw Dr. Abrokwah, reporting hip, back and right thigh and buttock pain. (R. at 1422.) Dr. Abrokwah reported Sykes had reduced and painful range of motion of both hips. (R. at 1422.) However, he reported Sykes's pain, depression, anxiety and insomnia were controlled and recommended he walk for exercise. (R. at 1423.) He noted Sykes was calmer, not agitated and more interactive. (R. at 1422.) Dr. Abrokwah assessed gluteal cellulitis. (R. at 1423.)

On February 2, 2019, Sykes presented to the emergency department at Norton Community Hospital for complaints of pain and swelling in both hips. (R. at 1432-43.) Sykes's gait was steady; he had full range of motion; he had intact circulation, movement and sensation in both the upper and lower extremities; he had erythema in his right upper leg and gluteal area; and his mental status examination was normal. (R. at 1433-35.) A CT scan of Sykes's pelvis revealed either soft tissue calcification or foreign body in the right gluteal muscular region.

(R. at 1429.) Sykes was diagnosed with bilateral hip pain and calcifications, and a history of myositis and ossifications was noted. (R. at 1433.)

On March 21, 2019, Sykes saw Dr. Amit Patel, M.D., a physician with Quillen College of Medicine, and reported bilateral hip pain. (R. at 114.) He stated he had difficulty ambulating and felt like he was sitting on a beach ball. (R. at 114.) Sykes appeared uncomfortable; he had an antalgic gait; both hips had tenderness to palpation, but no erythema or induration; his orientation, memory, attention, language and fund of knowledge were normal; and he had an appropriate mood and affect. (R. at 115-16.) On April 5, 2019, an MRI of Sykes's hip showed scattered faint edema and enhancement in the bilateral gluteal muscles and bilateral quadratus femoris muscles. (R. at 117-18.)

On May 8, 2019, Sykes saw Lawrence Livengood, P.A.-C., a physician's assistant with Appalachian Orthopaedic, and reported muscle aches and weakness; arthralgias; joint and back pain; and swelling in his extremities.[21] (R. at 128-31.) Sykes's lumbar spine had tenderness to palpation; he had pain in his back and legs with active extension of his back; he had mild stiffness with rotation of the lumbar spine; he had intact sensation in both lower extremities; his reflexes were absent in the right knee and ankle, and his left knee and ankle had 2+ reflexes; he had positive seated knee extension on the right, negative on the left; manual muscle testing showed weakness of the extensor hallucis longus and plantar flexion of the right foot; he had intact dorsiflexion on the right; and he had an antalgic gait. (R. at

---

[21] Sykes first saw Livengood on February 2, 2017, and he diagnosed cervical radiculopathy and ulnar nerve entrapment. (R. at 765.) He next was seen on March 29, 2017, and Livengood diagnosed degeneration of the cervical intervertebral disc and ulnar nerve entrapment. (R. at 760-62.)

130.) Livengood diagnosed spinal stenosis of the lumbar region and lumbar radiculopathy. (R. at 130.) On June 13, 2019, an MRI of Sykes's lumbar spine showed mild facet arthropathy at the L2-L3 level, mild bilateral foraminal narrowing at the L3-L4 and L5-S1 levels and moderate bilateral foraminal narrowing at the L4-L5 level. (R. at 106-07.)

On June 19, 2019, Sykes saw Livengood and reported back pain that radiated down the right lower extremity with weakness, tingling and numbness in the right lower extremity. (R. at 126-28.) Sykes's examination findings remained unchanged. (R. at 128.) Livengood diagnosed lumbar radiculopathy and administered an epidural injection. (R. at 128.) On August 21, 2019, Sykes complained of back pain. (R. at 124-26.) He reported the epidural steroid injection was helpful, but he continued to have back and leg pain. (R. at 125.) Livengood diagnosed lumbar radiculopathy and administered a repeat epidural. (R. at 125-26.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Sykes argues the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Sykes argues the ALJ erred by rejecting the opinions of Dr. Abrokwah and Fields and by relying on the opinions of the state agency physicians. (Plaintiff's Brief at 6.) Sykes contends the state agency consultants' assessments were "stale [and] outdated." (Plaintiff's Brief at 6.)

The ALJ is not required to adopt a residual functional capacity assessment of a treating or examining physician in determining a claimant's residual functional capacity. Instead, the ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c) (2020); *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2020) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner). The relevant question is whether the ALJ's residual functional capacity assessment is based upon all the relevant evidence, including medical records, medical source

opinions and the claimant's subjective allegations and description of his own limitations. *See* 20 C.F.R. §§ 404.1545, 416.945 (2020).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ found Sykes had the residual functional capacity to perform light work, except he could occasionally perform postural activities, but could not crawl or climb ladders, ropes or scaffolds; he could frequently perform reaching, handling, fingering and feeling with the left upper extremity; he should avoid concentrated exposure to industrial hazards; he could understand, remember and carry out simple instructions and perform simple tasks; he could occasionally interact with others; he could adapt to occasional changes in a customary workplace setting; he could not perform a job with reading or writing requirements; and he would b expected to be off task less than 10 percent of the workday. (R. at 21.)

In making this residual functional capacity finding, the ALJ stated he was giving "some weight" to the state agency consultants' assessments and to Fields's opinion. (R. at 26-27.) The ALJ found Carne's opinion was somewhat consistent with the record, in that the record supported his finding that Sykes had moderate limitations in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 26, 140-41.) Similarly, the ALJ found Dr. Bockner's opinion somewhat consistent with the record, which supported additional limitations based on Sykes's continued mental health treatment and his testimony that he suffered from poor focus, memory and concentration. (R. at 26.) Therefore, the ALJ also found Sykes had moderate limitations in his ability to adapt or manage himself. (R. at 26.)

The ALJ found Fields's opinion was consistent with the record, in that Sykes would have limitations in social functioning, handling a stressful work environment and being off task due to experiencing psychological symptoms. (R. at 27, 567-71.) However, the ALJ noted Fields's opinion did not specify to what degree Sykes would be limited in these areas. (R. at 27.) The ALJ noted Sykes sought routine treatment through his primary care provider and rehabilitation facilities and experienced occasional relapses. (R. at 25.) Sykes generally had intact memory, concentration, insight, judgment, orientation and thought process. (R. at 26.) In addition, the ALJ noted Sykes reported symptom control with treatment and typically had mild to no findings following objective examinations. (R. at 27.) Dr. Abrokwah noted that Sykes's symptoms were stable, and he presented as more coherent and less agitated. (R. at 25.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ also addressed Dr. Abrokwah's check-box mental assessment, indicating Sykes had marked and extreme limitations in multiple areas of mental functioning. (R. at 28.) As the ALJ explained, he gave "no weight" to Dr. Abrokwah's mental assessment because it was inconsistent with his treatment records, which indicated Sykes's mental health symptoms were controlled with treatment. (R. at 28.) Also, as noted above, Sykes often had mild to no abnormalities on multiple examinations, including intact memory, concentration, speech, behavior, insight and judgment. (R. at 28.)

The ALJ explained he was giving "significant" and "great" weight to the opinions of the state agency physicians, who, after reviewing the medical evidence, opined Sykes could perform light work with occasional postural activities, except

he could never crawl or climb ramps and stairs. (R. at 27.) The ALJ found these assessments were consistent with the medical record as a whole, but he modified the assessments slightly to most accurately reflect all new evidence of record, including Sykes's subjective allegations that he testified to at his hearing. (R. at 27.)

The ALJ gave "little weight" to Dr. Pella's opinion that Sykes would be limited to medium[22] work because it was inconsistent with the record. (R. at 28.) The ALJ also gave "little weight" to Dr. Abrokwah's medical assessment that Sykes could perform less than sedentary[23] work because it appeared to be based on Sykes's subjective allegations rather than the results of an objective examination or review of the record. (R. at 27-28.) *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (2020) ("[t]he more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion"). The ALJ noted the medical evidence did not suggest Sykes was limited as opined by Dr. Abrokwah because Sykes typically had conservative treatment with mild findings. (R. at 28.) Dr. Abrokwah regularly reported Sykes's pain was controlled with medication and recommended he exercise. (R. at 790, 1343, 1377, 1379, 1416, 1425.) *See Gross*, 785 F.2d at 1166.

---

[22] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2020).

[23] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2020).

In 2017, a CT scan of Sykes's cervical spine showed no evidence of acute cervical spine fracture or subluxation; his thoracic spine CT scan was normal; and his lumbar spine CT scan showed minimal, multi-level degenerative disc disease and mild splenomegaly. (R. at 741-44.) In January 2018, Sykes's extremities were nontender with normal range of motion and no edema; he had no motor or sensory deficit; and his gait was steady and normal. (R. at 1102.) Sykes reported his pain improved with medication, and in, March 2018, he reported he was able to ambulate without assistance and was becoming more active. (R. at 790, 1038.) In February 2019, Sykes's gait was steady; he had full range of motion; he had intact circulation, movement and sensation in both the upper and lower extremities; and he had erythema in his right upper leg and gluteal area. (R. at 1433-35.) A CT scan of Sykes's pelvis showed no evidence of recurrence of the right gluteal abscess, but instead showed either a soft tissue calcification or a foreign body. (R. at 1429.) In June 2019, although Sykes's physical exam showed some abnormalities, an MRI of his lumbar spine showed mild facet arthropathy at the L2-L3 level; mild bilateral foraminal narrowing at the L3-L4 and L5-S1 levels and moderate bilateral foraminal narrowing at the L4-L5 level. (R. at 106-07.) In December 2017, Sykes's case manager provided him with the opportunity to apply for work at Kelly Services, and in January 2018, Sykes requested a work excuse. (R. at 1082, 1238.) Furthermore, Sykes's activities included taking care of beehive stands, preparing meals, hunting, fishing and ginseng hunting. (R. at 568, 770.)

Sykes argues that the ALJ should have given the state agency consultants' assessments less weight because they were "stale [and] outdated," as they did not have the benefit of reviewing the updated records and opinions from his treating providers. (Plaintiff's Brief at 6.) However, the simple fact that those opinions

came later in time than the state agency opinions does not mean that they should be accorded greater weight. As the Third Circuit has noted, "[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *see also Stricker v. Colvin*, 2016 WL 543216, at *3 (N.D. W. Va. Feb. 10, 2016) ("[A] lapse of time between State agency physician opinions and the ALJ's decision does not render the opinion stale.")

It is apparent from the ALJ's very thorough decision that he carefully evaluated the whole record before him when weighing the opinion evidence, and he ultimately found the state agency medical opinions finding Sykes could perform light work were consistent with the record as a whole.

Based on this, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his residual functional capacity finding. An appropriate Order and Judgment will be entered.

DATED:    March 21, 2022.


/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE